Next case is number 25-1295 Carolyn Gardner against Kutztown University. My name is Hannah Kogan. I am a Deputy Attorney General at the Office of Attorney General here representing the appellant Kutztown University. I would like to reserve four minutes for rebuttal.  Thank you. The District Court erroneously determined that Kutztown University, a Pennsylvania State University, was legally required to allow one of its professors that moved to North Carolina to teach 100% remotely, online, full-time. If this Court does not reverse that novel ruling, it will have far-reaching consequences. I want to provide KU's position in three parts. First, this Court must reverse where summary judgment should have been awarded to KU because in-person, face-to-face teaching is an essential function of a full-time associate professor like Gardner at KU. Where does it say that in the University's policies? So it's not written down in the collective bargaining agreement and there's no written job description here, but that's actually quite unsurprising. Gardner was hired in 2006 and since that time... It's unsurprising back then, but you would think people, these universities would have updated their policies post-COVID, right? I mean, there was a tremendous amount of online learning during COVID, right? There was, under state and federal orders, essentially. Right. So once we're coming out of the pandemic, you want to get the kids back in school and you want to get the teachers teaching the students back in school, so you adopt policy saying that, right? Sure, Your Honor. And I would admit, though, that the first thing, as you mentioned, was returning to the classroom in-person, face-to-face. It is not in the record here, but KU actually has since updated some of those policies and it is now written down that face-to-face learning and instruction is the default mode of instruction. That's not in the record here, but that, I don't think, is a concern because we look at what is the essential functions of the job at the time of the alleged adverse employment action. How do you reconcile your position with the that KU offered and promotes that it offers and it continues to offer courses remotely? Sure. So this is a state university with thousands of students. It is not, and it is predominantly, as the record shows, an in-person, face-to-face institution. However, just like most universities, especially state universities, it also has non-traditional students and graduate students and other types of programs, certificate programs, where it is offering those in non-traditional formats as well. It wants to be an accessible institution like all across the board as a state university. I think I heard you say that either there's a material dispute of fact, and so we should vacate and remain because of that, or KU is entitled to summary judgment on this. But is it really your position that KU is entitled to summary judgment if we're considering qualified individuals? I don't see how you get there given that you have, you know, it's not in the collective bargaining agreement. You offer remote courses, you promote that you offer remote courses. How could KU be entitled to summary judgment on this issue? So the first thing I would say, Your Honor, is that the one thing that is required by the court to consider is the employer's judgment. It's not the only thing required. No, the EEOC then has the seven factors listed. And I think you pointed to two of the seven. I understand your point that maybe there's a material dispute of fact. I'm trying to get at your point that KU could be entitled to summary judgment. Right. So of the seven factors, I think maybe two are neutral. I believe Gardner says that they weigh in her favor in terms of the lack of a written job description and the collective bargaining agreement, as you mentioned. But the remainder of all seven of those factors from the EEOC all weigh in favor of KU here. So how do you get there with that weighing evidence? Because I don't think we can do that on a motion for summary judgment, right? You're correct, Your Honor. You cannot weigh that evidence, that summary judgment. And I would say that the district court very much did that here. And that was wrong. If this court is not inclined to say that the overwhelming evidence where no reasonable juror can dispute that it was essential function to be in person, if this court chooses to disagree with that, then there is a dispute of material fact. And summary judgment is entirely precluded for Gardner on all six claims. Because we then have a question of whether or not she's even a qualified individual under the Rehabilitation Act. And this court would have to reverse entirely right then and there. Let me ask you a question about count two. Did KU argue that it's entitled to summary judgment? Because the policy, are you arguing that it's because the policy doesn't resemble essentially 100% healed policy? Is that essentially the argument? I want to just back up a little bit because it is a little bit confusing. From the complaint, the policy that was alleged as facially invalid was that there was a full duty work rule. That's from the complaint. And it's that same policy then that you have for count five. So one is the facially invalid and then count five was the disparate impact. And I want to make that distinction there. But both claims are alleged under that same policy. To answer your question, I think more directly, there is no 100% healed policy here. There was no requirement that she show she is 100% cured or healed. And she has to show proof of that before she could return to work. I'm not sure where the district court decided to pull that from. But that just is non-existent here. There's no evidence of 100% healed policy. And was it properly preserved in the opening brief that there was no 100% healed policy? I believe so, Your Honor. I think just remind me where that shows up in the opening brief. I could shuffle my papers, perhaps on rebuttal, I can pull that for you. But I know we said that it was wrong, at minimum in our opening brief. I think we probably did do it a little bit more squarely because in what then happened, again, this is kind of the just a response brief, was that somehow this policy has now been, I don't know, changed to a 100% policy that all accommodations that are requested are unilaterally denied. So we have, there's been a lot in terms of what's been alleged as the policy or what sets forth. And I think then we address it in our reply brief as that there was also no policy that KU unilaterally, uniformly denies all accommodations requested. Okay. How do you, how do you establish what is an essential function? Does that require expert testimony? Does it require statistics? No, essential function, I would say the inquiry actually prioritizes the employer's judgment as to what functions of a job are essential. That's at 42 USC section 1211 subsection eight, where it defines qualified individual. And so in fact, courts are again, required under the statute to consider the employer's judgment. And then you have the seven factors by the EEOC at 29 CFR section 1630.2 subsection N3. And again, even in those seven factors from the EEOC, it again says to consider the employer's judgment. And I would just note that makes sense, right? Because the employer creates Courts don't have to take the employer's word for it, do they? At summary judgment, they must consider it, your honor. That's the evidence that was provided was the reason I asked the question is, why isn't it more important to look what schools do than what they say? Right? So for example, let's say there had been a written policy here that said, we think that it's essential to a college education that people are in the same room together, conversing and learning. That's the official written policy. And then the school on its website says, uh, we also encourage remote learning. And it turns out that, you know, 70% of the students at the school are remote learners. Does a court have to accept as official policy, the truth that it's in-person learning is, is an essential function of the job. If you know, 70% of the classes are offered online. Um, your honor, I would say that to clarify it's the employer's judgment is not dispositive. Um, but no, but I'm trying to get at how courts ascertain what the employer's judgment is. And what I'm suggesting is that a lot of employers say things and then their conduct belies what they say. They say we are an equal employment opportunity firm, and then they discriminate, et cetera. So help us with the potential disconnect between what employers state is an essential function of the job and what in practice happens. Sure. Well, I would say I would still first say here that it's actually undisputed that prior to COVID only 6% of classes and course offerings were online. So, and that that's undisputed that you send president Hawkinson's testimony. Um, you can also look at the courses that professor Garner was teaching. I would direct this court's attention to joint appendix 1418 and the subsequent pages until 1424. You can see from, and it begins, I believe all the way back in fall 2006, um, her, the list of courses she taught each and every semester since then, you can see that it's predominantly in per it's in-person. She always seemed to have some remote, but predominantly in-person max one online course per semester as undisputed under this record. And that's right, but we don't have any policy that says, you know, we prefer in-person, but every once in a while, or, you know, you can teach 20% of your classes online, but not a hundred percent of your classes online. We don't know. We don't know what the policy is because the school has been very vague about that. Well, no, the school has been actually quite clear that in-person teaching is what KU has predominantly been as an institution. And that's what it provides. And the record's clear that that's predominantly the case, but at the same time, there has been a consistent pattern of online instruction. And what I'm still wondering about is what are the essential functions of this job, which is necessary to determine whether someone is a qualified individual. Sure, your honor. I think this actually points exactly to why it is so difficult to determine this and why this court has actually previously said that generally speaking, that the essential function question is a question of fact. It should go to a jury to, again, like Judge Montgomery Reeves was saying, there's a lot of different facets to it and we don't want to weigh the evidence here. The EEOC again has its seven factors. It's non-exhaustive. One factor is not, you know, dispositive of the whole thing. It's at least guidance. And again, the problem here is that on this record, it was clear what the essential function was of an associate professor that was full-time at KU at the time of the alleged adverse employment action here. Things may change. Employers may change across the board. That's exactly why this court has said you take this question very much so is done on a case-by-case basis. I want to ask you a question before you sit down about count five and looking at the EEOC guidance that you were referencing and the EEOC's examples of sort of no exception rules, right? And thinking about whether or not everyone's coming back to work in person is a no exceptions rule. I believe the last or the next to last example they give is this, issuing a policy or requirement that purports to limit an employee's rights to invoke ADA protections, e.g., a fixed leave policy that states no exceptions will be made for any reason. Help me understand why the policy at issue here doesn't fall within that example. Sorry, just to clarify, you said count five. Do you mean count two? You will count two. We're talking about the 100% heels. So I honestly, that's perplexing from the district court, from my viewpoint, because there was no leave policy here or in the record that said no accommodations. In fact, I'm pretty sure it's undisputed and in their response brief on appeal, they agreed that the accommodation or the employee accommodation policy was compliant with the ADA. So I don't, I'm hoping that is responsive, but there is no fixed leave policy here that says that no accommodations are permitted. Your point is because there are some accommodations, there's a, there's an effort to make some accommodations. You cannot, this, this, this wouldn't apply. Yes, of course, Your Honor. They, they offered reasonable alternatives here and the Rehabilitation Act does not require an employer to grant a, any, the requested accommodation. It's required to provide a reasonable accommodation. The employee is not entitled to the accommodation that they prefer or that they ask for. Thank you. Right. Thank you, Ms. Kogan. We'll hear from Ms. McKinley. Good morning, Your Honors and may it please the court. My name is Lori McKinley and I'm here representing Carolyn Gardner. What we've just heard is actually astonishing. Counsel is here talking about defending the case based on a policy that's not even what this case is about. No one has ever suggested that the policy that the district court ruled in our favor on summary judgment was KU's published accommodation policy. That policy is legal. It detracts the language of the ADA section 504. What happened in this case is that KU adopted an unofficial policy in anticipation of the fall 2021 semester, which specifically would exclude this particular category of faculty with immune suppression disabilities from securing an accommodation, a remote work accommodation at a time when it was extremely dangerous for them to return to a congregate setting. Does that mean you're arguing that the school was not entitled to adopt a policy that required in-person learning? Yes. Why not? Why can't a school say that an essential function of teaching students is being in the same room with them? Okay. Well, first of all, there is no such thing. I understand that. I'm asking, that's part of my, I understand they didn't have a policy that said that. I'm asking you, could a school say that? Well, they could have a policy that says teaching in person is what we want to have. It's not what is going on here. Let me rephrase. It seemed like you were arguing or that the import of what you were arguing a minute ago was that it would be illegal for a university to have a policy that says, because we think in-person learning is essential to college education, all instructors must show up in the classroom. Okay. Well, I think there are a couple of things going on here. First of all, the specific context of this specific unofficial policy was in the context of accommodation. You can have any rule you want about what generally happens in an employment setting, but we're talking about accommodations. Let me try that again. It must not have been a clear question. I'm asking you a legal question, not asking about the facts of this case yet. It sounded a minute ago like you were arguing that it would be illegal under federal law for a school to say that whereas in-person learning is essential, teachers must be present in class. Would that be a legal policy or not? Well, I would have a problem with it in the sense that any policy that is generally applied and says we don't do accommodations here would be illegal. We're not suggesting that Kutztown can't have a rule or an expectation policy, what have you, that says this is how we want to do it. We think it's essential that we have people in the classroom to the extent possible. However, what he's trying to get at is it's not to the extent possible, except as hypo. There's a school that says in-person learning is essential. Make it a school that has students with learning differences, and so there's some reason that remote learning does not work. There's a school that says we have a policy of no remote learning. We don't offer remote learning to any student. We don't allow any professor to do remote learning or any teacher to do remote learning. Now, you mentioned after that, well, you can't have a policy with no accommodations. Completely agree with you, but is it illegal to have a requirement that you have in-person learning? We're not dealing with other accommodations. We're not thinking about yet masks, distance, plexiglass. We're not thinking about any of that. His simple question is, would it be illegal under federal law to say in-person learning? No exception. I think the no exceptions is where it becomes illegal when you're applying that in a disability context, and what happened here. Why though? I mean, I don't understand that because I'm talking about the essential functions of the job. I'm not even getting to accommodations. I mean, what if the job posting is to work on the road crew at night? It's your position that that can't be an essential function of the job, and someone could come forward and say, hey, I want the job. I'm qualified. I know how to work on a road crew. I'm good, but because of some medical condition I have, I can't work at night. Well, it's your position that that's illegal? I think there road crew is not a good analogy for what is going on in this case. We understand that whatever we write is going to have implications for every next case, right? So we're trying to think, what are the ramifications of what you're asking us to do? Well, there's a specific protocol for determining what an essential function is. It isn't something that can be generally applicable to every work setting, and that's why I'm having problems with the road crew example. Well, I was trying to give you the example of teaching. A lot of people think, many disagree. I mean, some schools are entirely online, right? Okay, but other schools say, we actually want to run a seminar here, and we want 12 students in a classroom with a PhD educated professor, and they can talk for two hours. And what I hear you saying is that's illegal unless you provide, quote, reasonable accommodation for the professor, and that reasonable accommodation might include the professor not being physically able to be present in the room. It might, and that's exactly the situation in this case. And what I really wanted to clarify was, Kutztown's official accommodation policy is not what the issue is here. This is a secret policy that was adopted before the semester started in anticipation of people with the exact kind disability that Dr. Gardner has, asking for accommodations. The person who ordinarily is in charge of processing accommodation requests at Kutztown testified, as these types of requests, requests for accommodation, were coming in, Kutztown's administration were already in talks to develop broad languages of how they were going to deny these. Converting in-person courses to online, moving forward, we're going to deny all of those, and that's what they did. They used a specific template that specifically says, no, we're not going to provide any remote teaching assignments. Which sounds a lot like an unstated policy that they wanted everyone to be physically present, right? But they did it specifically for use in the accommodation context. No one's saying that everybody at Kutztown should be allowed to teach online. This is a specific question about disability accommodations and federal law. And the president clearly wanted to get people back to campus, right? The president decided that that was what he wanted, that's right. However, you can't establish an essential function after you've denied the accommodation, and you asked questions earlier about full-time, full duty, and you have to remember this case was not in isolation, there was a related case. And the way that came up is the professor in the other case, Dr. Oros, made the same exact request. It was denied for the same exact reason, word for word, and then the spring was coming. He said, well, what about the spring? And they said, well, you have to be full-time, full duty. And he said, well, what does that mean? Well, that means you have to be able to teach in person in the classroom. You can't come back without a doctor's note that says you can do that, even for the classes you're already scheduled to teach remotely. So that's where this contest comes in. And this is exactly the kind of blanket policy, and no exceptions, no remote accommodations, no exceptions, no matter what the circumstances were. And that's why we got summary judgment. The facts in this case are undisputed. You just mentioned the other person with the doctor's note that they needed a doctor's note to come back. And then you mentioned blanket policy. I want to make sure I understand precisely what counts we're talking about. Are you talking about count two? Is this the policy that we should be thinking about with respect to count two? The blanket policy is really at the core of everything, because that is what drove everything that happened here, was this unofficial policy. We don't want to give any of these people remote accommodations. And the blanket policy is in-person teaching. Well, but the blanket policy is, right, we're not going to provide any exceptions. I mean, no remote accommodations, no exceptions, basically. So the whole idea of their usual policy, where you make the request and go through a process, and whatever the facts were would determine in that process, this whole policy, the unofficial policy, went around that. It just made accommodations, remote accommodations, unavailable. So it was just a no. And the vice president, who was the person in charge of HR, said the HR director didn't have any authority to say yes. That's what a blanket policy is. Let me ask you a question about counts one through five. Do you agree that what counts one through five, in order for you to have a claim under the AR, you have to be a qualified individual? Right, you have to be a qualified individual, sure. Yes. Okay. All right. Now, my next question is, your friends on the other side say, okay, to be a qualified individual, you have to be able to perform the essential functions of the job. We all agree that that's correct. With or without accommodation. Yes. Agree. Okay. Now, my question for you is, we're on a motion for summary judgment. Right. Which means that you have to be entitled for summary judgment, as a matter of law, based on the undisputed facts. That is, if there's a material dispute of fact, you're not entitled to summary judgment. What I want to understand is, we have on the one hand, and I'm focusing on the question of essential functions of the job. On the one hand, we have the president of the university testifying about the essential functions of the job. We have the EOC guidance, which tells us that we look to what the university says about its policies. On the other hand, we have things like the collective bargaining agreement doesn't say anything. There are some courses offered online. Your friends on the other side may say, well, the fact that it's just 6% supports us. You may say, well, the fact that it exists at all supports us. My question for you is, how can you resolve any of that at this stage without weighing evidence? Because we have undisputed facts. What's the undisputed fact about the essential function? The undisputed facts about, I mean, I think you can't, no, there's, well, there is an undisputed fact. Prior to receiving remote accommodation requests from Dr. Gardner and the other five high-risk faculty, there was no policy, contractual definition, or pre-existing job description defining full duty for an associate professor, much less one stating that teaching in person in the classroom is an essential function of the job. Let me ask you something. Is the president's testimony evidence? Well, all testimony is evidence. Yes, I agree with you. So my next question for you is, is it evidence that can be ignored at a motion for summary judgment? I think it can in this situation because it was devised specifically for purposes of making accommodations that were feasible, reasonable to address a specific kind of disability unavailable as a matter of institutional policy. That is a direct violation of- I'm just questioning his motives, though, not the legitimacy or the accuracy of his verbal policy. Well, you can't have a verbal policy and say it's an essential function. Well, I'm- An essential function can't, okay, yes, okay. That's not how it works. You know what I mean? Every single employer needs to have a written description of every job in order for that to qualify as an essential function of the job. That's the thing. The essential functions of a university professor in this university system, which is all covered by a single collective bargaining agreement, are different depending on what the person does. And the essential functions of the job are articulated in the collective bargaining agreement, which is effective teaching, scholarship, and service to the university. Is there something in there that says the essential functions are these, they cannot be articulated anywhere else? No. Then so how can we say, how can we ignore evidence? I understand your point, right? Your point is, this doesn't make any sense. They're talking out of both sides of their mouth. The collective bargaining agreement doesn't say it. There's nothing before that says it. They are allowing people to teach remotely before. I don't buy this, right? I get that. My question is only, can we make that decision at a motion for summary judgment stage, or is that a decision that has to be made by the fact finder? Are we finding facts? We found the facts and provided them to the court. The court applied the facts that were stipulated. That's how we got to where we are. I also would like to bring up- Wait, hold on one second before you move on. When you said the court found the facts, a minute ago in response to Judge Montgomery Reese's question, you said, I think quite rightly, that the testimony of the college president is evidence. His testimony was that in-person instruction is an essential function of job. That might be balderdash, but that was his testimony. That testimony is in conflict with many other things in the record that you've ably cited, including the CBA and other things. At this stage, can we say, I just don't believe that? Yes, because the undisputed facts are that the essential functions of the job, effective teaching, not how the teaching gets done, because that is going to be different for everybody. No one is suggesting that if Dr. Gardner was in the classroom, that she was qualified to teach her class. No one's suggesting that. This is really a virtual ramp. We're closing the door saying, no, you can't come in. She was going to be, because we're going to be in the classroom, just as they usually would be, all of the materials, the learning outcomes, the evaluation of whether the students are meeting those learning outcomes, all of those things that go into effective teaching would have been exactly the same. The only difference is that she would have been on the screen right there. Everybody else would be there just like they always were. They can interact with each other. They can see each other. After she had a disability that made it potentially life-threatening for her to be in the physical classroom. I wanted to bring up a case that was decided by the Commonwealth. Is she back in the classroom now? Yes. She's been back since March of 2024. And that's- She's been in an accommodated classroom. It's a separate classroom. You just said if she went to the class, it would be perilous. I was talking about, during the period of time we're talking about, she wasn't released to return to work in the accommodated workspace until January of 2024. So there's been a change in condition. Yes. She's back to work. She's been back to work. I mean, in health condition, there's been a change. Well, I would say more that there's been a change, not in the health condition now, but a change in the- Well, if the condition's the same and she's in the class and everything's okay, why couldn't the school require her to be in class three years ago or four years ago rather than now? Well, because the situation with COVID has changed since then. We have a higher degree of immunity. It's safer than it was when we were talking about- People still get COVID all the time. Well, they do get COVID. And Dr. Gardner got COVID her first day back to work. Fortunately, at that point, the strains are less lethal, and we have a lot more vaccinated people. So the situation has changed, not her health condition. Vaccinated people can transmit COVID. I'm sorry, what? Vaccinated people transmit COVID all the time. Well, that's right. And it's not that it's- So what good is it that people are vaccinated? We still give each other COVID- I got COVID in this building in September of 2024. Thank you very much. It's everywhere. It's everywhere. But in any case, I wanted to bring up this case because I think it's really important. The Commonwealth Court of Pennsylvania decided a case in January of this year, a few weeks ago. And it comes out of the same university system, same collective bargaining agreement, all of that. And it came up in a contractual context because the case went through the grievance process. And the arbitrator determined that there was no evidence that face-to-face teaching was an essential function. It was another person who required a remote accommodation, but not because of immune suppression, because she had a brain aneurysm. There's nothing in the CBA, there's no policy, nothing in any course catalog. People, including this particular person, have been allowed to teach remotely before. There's no- There's nothing- You know, work performance, it was not about that. That was not why they were denied. And so the ability to teach, to effectively teach by whatever means that could be accommodated, full-time or virtual, there's no cost to the university. What they called the interactive process was a total sham. All they did was consider their own interests, not including the individual. And so basically, they rejected the university's argument that teaching in person was an essential function of the job. The facts just aren't there to establish what an essential function is. An essential function is what the job exists to do. The job exists to teach effectively, to teach effectively. Right. And can a school, to take us back to where we started, is it the prerogative of a school to have an opinion that to teach effectively, everyone needs to be in the room together? I guess I'm struggling with your honor. And what I'm trying to convey is that how we usually do things or how we want to usually do things isn't the issue. The issue is, can we reasonably accommodate that function so the person can do the job? So your answer is no, if it doesn't have a remote exception. There always needs to be a remote off-ramp for some number of instructors. Right. In this particular type of work context under these particular facts. So the way we used to do things, the way we usually do things, that's why we have Section 504. That's why we have the ADA. The whole point was that we have to do things differently. We have to treat people with disabilities differently in order to bring them up to an equal playing field. And that's why I think the example of Casey Martin is really a good one, because it's a really good visual explanation of what we're talking about. If you have an unlevel playing field, someone that can't walk from hole to hole on the golf course in a PGA tournament, he has an unlevel playing field, literally, by walking uphill instead of on a level playing field. But when he gets to the hole, he can do what everybody else does. And that's the same thing here. Once Dr. Gardner has access to the classroom... But the key to that decision was that walking was not an essential function of pro golf. Right. Exactly. It was how he got to the hole, not what he did when he got there. And that's exactly what we're talking about. Once he's got access to the classroom, I just think the access thing is very important. Let me ask you one more question, because your time is probably running short. And my question is focused on the requirement that you have... Hold on. It's really just a disparate impact claim. Do you have any statistical evidence showing that the policy disproportionately affected disabled faculty as a group? I'm thinking about the Oxford House case that says that you would need statistical information. I didn't see that. You don't need it in a Rehabilitation Act case under the disparate impact provision because you can either bring your case involving the group or as an individual who's screened out of a specific kind of job based on policies. And again, policies under the ADA in Section 504 are one thing that can and need to be accommodated if they are used as barriers. I just want to make sure I understand. Your point is under Oxford House, you need it for an ADA claim, but you don't need it for an RA claim? Because Oxford House says you need it for an ADA claim. I'm sorry. I don't know that case. Okay. Well, is it a Title II case? It's an ADA group case. Employment case? Yes. It's an employment case. Yeah. I don't know what you're talking about there, but the statute specifically says individual or individuals. It specifically says that you can have a screen out case because let's think about how this works. Well, that just means the disparate impact portion of it, not the direct evidence claim, but the disparate impact. No, I understand. And for disparate impact, this policy, this unofficial policy that was used to preclude these accommodations was only going to apply with people with disabilities. So by definition, it applied 100% to those people. And clearly that was the reason that she was permitted to return to work as the district court found. I mean, there's no dispute about that. The whole point of statistical evidence, for instance, in Title VII is to establish causation. You don't have that issue here. We know it's causation. And when you think about disability as opposed to race or gender or some of the things where we are used to talking about disparate impact, you can have a workforce with one person with epilepsy, one person with diabetes. You have a policy that's excluded that person. You don't need a class of people. That person has been excluded. It's a disparate impact, a screen out case, and you only need one. And that's what we have here. Judge Roth, any other questions for Ms. McKinley? No, no, no more questions. All right. Thank you, Ms. McKinley. We'll hear rebuttal from Ms. Kogan. All right. Could I ask you to start with Judge Montgomery-Reed's question about the comparator evidence? Count five. So count five, disparate impact. The statute that we're relying on about screening out is an ADA statute. And as I believe you mentioned, I would actually start with saying that I don't believe this circuit has squarely said whether or not a disparate impact claim is permitted under the Rehabilitation Act. If this court wants to address that and say one way or another, I would say go for it. But I would point this court to at least four district courts in this circuit who have addressed it. And all of them have said that you do need statistical evidence to establish such a claim. I provide those cases at page 22 of my reply brief. I would also point this court to at least the four circuit courts, the 10th, 7th, 2nd, and 11th. All also require evidence showing significant disparity, statistical or otherwise, to establish a disparate impact claim. Those cases are on page 24 of my reply brief. And I would say here, she has not established a disparate impact claim. She has only said me, myself, and I. I was screened out because this payee requires that I be in person and that has a disparate impact on disabled individuals at large. You cannot just point to yourself to establish a disparate impact claim. And I would point also to, I know we talked a lot about essential function, but regardless of the determination on the essential function issue, KU was still entitled to summary judgment on all six claims. This court has to reverse because Garner cannot establish each claim as a matter of law. As I just said, the disparate impact claim, that's just one of the six here. And I believe- What about count six? Count six- Interference. What's your argument on that? Sure. So an interference claim, it has also not often been addressed under the Rehabilitation Act by this court. But interference is aimed at actions that are more akin to harassment. The statute actually says, interference, coercion, or intimidation. There's no evidence here, let me continue actually. It prohibits coercion, intimidation, threats, or interference with an employee in the exercise of statutorily protected rights under the ADA. Because again, we're relying on the ADA statute regarding interference, but here there's no evidence of interference or harassment regarding- Is it your argument that a dispute between parties over reasonable accommodation can't be an interference claim because they're just two different things? A plaintiff cannot say that the denial of their accommodation request is interference. That's not what that statute is getting at. I would point this court to, I mean, the same actually decision that the district court pointed out was Minokin versus Dillon, which is the DC Circuit case. There, the employer was trying to persuade the employee to accept some sort of conditional settlement offer when trying to do the accommodation request. That was also at the pleading stage, so I think it's different on the procedural step there. But also the Third Circuit in 2017 revoked the Cow Pet. There was a genuine dispute of material fact where defendants harassing messages posted publicly online may have been on account of and therefore causally connected to the plaintiff's exercise of their fair housing rights. We don't have any of this harassment or intimidation or coercion in the record here. So again- What about your friend's argument that this unwritten policy really was not about getting everyone back to work, it was about automatically rejecting all requests for accommodation? Right, so I would then say that's pointing more towards the intentional discrimination claim based on pretext, which in the first instance I would point out to the court that they did not move for summary, Gardner did not move for summary judgment on, only KU did. So there was a procedural misfire there in terms of these disreports to Esponte awarding summary judgment to Gardner on that claim without prior notice to KU or advance notice pursuant to Rule of Civil Procedure 56F. But in any event, there is still no evidence in this record that the policy or the legitimate reason which the court said it was legitimate that you have to have a, that it would be a fundamental alteration of course offerings. There's nothing in the record to demonstrate that that was pretextual and what the KU was really trying to do was discriminate based on disability. And under the Rehab Act, it's even a higher bar I would say than an ADA claim because under the Rehab Act, under the statute, it has to be solely by reason of the disability. That's 29 USC section 794A. So any other alternative reason for the denial of the accommodation class or any of the alleged employment actions here, the employer's actions here, any alternative reason would actually be fully dispositive of all of her Rehab Act claims. I know my time is well up. I do want to just briefly conclude with saying that it is an employer's prerogative or school or university to have a policy or state that we require all of our employees to be in person. That's employer's prerogative. It is not illegal or a violation of the Rehabilitation Act to have a per se policy that you appear in person. And you agree that it would be better to actually say that rather than have it be some sort of sub-Rosa policy. Yes, your honor. It would of course be great if it's written down, but I think it's overwhelming here with the record that that is how it was historically done. That is how it was done. And the circumstances of the COVID-19 global pandemic were under very unique circumstances. I don't think did away with how it was historically performed at KU. Uh, so for all of those reasons, I would, uh, say this court should reverse. All right. Thank you very much, uh, Ms. Cogan. Thank you, Ms. McKinley. The court will take the matter under advisement.